Van Leuvan *v.* The First National Bank of Kingston.

---

CORNELIUS VAN LEUVAN, Respondent, *v.* THE FIRST NATIONAL BANK OF KINGSTON, Appellant.

(GENERAL TERM, THIRD DEPARTMENT, FEBRUARY, 1871.)

The defendant, a national bank, incorporated under act of congress of June 3d, 1864, advertised itself, by notices placed in its banking room and windows and in other ways, as a United States depositary, and financial agent of the government, for the exchange of seven-thirty government notes into five-twenty bonds, and were such agents and engaged in such business. Plaintiff, a stockholder of the bank, placed in the hands of its president at the bank, in banking hours, a number of these notes to be exchanged, and received from him a receipt therefor signed by him individually, and which had a printed caption containing the defendant's name, and the name of the cashier and president, and a statement that defendant was such depositary and agent. The notes were sent to brokers in New York with a letter signed (officially)

Van Leuvan v. The First National Bank of Kingston.

by the cashier, who had also been present at the time the bonds were received, upon which was a copy of the above mentioned printed caption of the bank, directing the brokers to sell the notes and credit the proceeds to the bank, which they did. The proceeds of the notes were credited to the president individually upon the books of the bank. The president's account was overdrawn at the time of the credit for more than the amount.

*Held*, that the transaction of the plaintiff was with the bank and not with the president individually, and that plaintiff could recover the amount of the proceeds of the bonds from the bank, after demand upon it and its refusal to pay the same.

*Held*, also, that the entries made by the agents of the bank, crediting the proceeds of the notes to the president, could not prejudice the rights of the plaintiff or affect his recovery.

It seems that, even assuming that the intention of the plaintiff and defendant's president was that the transaction was to be an individual one, and not with the bank, and that the notes were sold by the president to the bank, the bank would still be liable to plaintiff for the proceeds of the notes, the knowledge of its president and cashier being in law its knowledge of the agreement made, and that it had not been performed, and it not being therefore a *bona fide* holder of the notes, nor of their proceeds.

THIS is an appeal from a judgment rendered in favor of the plaintiff for the sum of twelve thousand nine hundred and fifty-six dollars and ninety-eight cents upon a verdict of the Ulster Circuit, directed by the court. The action was for the avails of $10,000 seven-thirty treasury notes claimed to have been converted by the defendants to their own use.

It appeared from the evidence that the defendant, a national bank in the village of Kingston, in 1867, advertised itself as the United States depositary and financial agent of the government, and had this heading to their letters, and painted on the bank building, and were designated to exchange seven-thirty notes for five-twenty bonds. The defendants were engaged as such, in making such exchanges. Jonathan H. Hasbrouck was the president of the defendant's bank, and its principal manager. The bank had advertised their agency to make exchanges, and had cards hanging up in the banking room, and at the windows, giving notice of such agency. The plaintiff was a stockholder of the bank,

and kept in the vault of the bank a tin trunk which contained his securities, etc. On the 11th July, 1867, the plaintiff went to the bank in order to exchange some seven-thirty government notes for five-twenty bonds of the government, and had a conversation with Mr. Hasbrouck on the subject. The interview, according to the plaintiff's statement, was as follows :

"When I wanted the bonds exchanged I wanted to know what he charged to do these things, and he told me, inasmuch as I was doing all my business there, he would not charge anything ; he didn't charge anything to those who did business at the bank, but there was some that he did charge, but he didn't charge customers in the bank like me."

This statement was not contradicted. Hasbrouck was not sworn. One of the clerks in the bank went to the vault of the bank and brought the plaintiff's tin trunk, which was opened in the banking room in the presence of the officers and clerks of the bank ; $10,000 of the seven-thirty notes were taken out, handed to Mr. Hasbrouck, the president, the tin box again locked, taken back to the vault by a clerk, and the president then gave the plaintiff a receipt in the following words :

"FIRST NATIONAL BANK OF KINGSTON.

" *United States Depositary and Financial Agent of Government.*

"JONATHAN H. HASBROUCK, *Pres't.*   ALFRED OSTERHOUT, *Cashier.*
"KINGSTON, N. Y., *July* 11, 1869.

" This is to certify, that I have received from C. M. Van Leuvan, U. S. seven-thirty notes $10,000, which I am to exchange for same amount of U. S. five-twenty bonds, and deliver to him.

"J. H. HASBROUCK."

On the same day, the defendant, through its cashier, sent these same seven-thirties of the plaintiff to Fisk & Hatch, government brokers in New York, preceded by the following letter :

" *U. S. Depositary and Financial Agent of the Government,*

" JONATHAN H. HASBROUCK, *President.*    ALFRED OSTERHOUT, *Cashier.*

"KINGSTON, N. Y., *July* 11*th,* 1867.

" Messrs. FISK & HATCH :

" GENTLEMEN.—I will send you by express to-morrow, July 12th, seven-thirty, 3d series, $10,000, which you will sell, and place the proceeds to our credit.   Respectfully,

"A. OSTERHOUT, *Cashier.*"

Fisk & Hatch received the seven-thirties from the defendant, sold them, *and remitted the avails,* $11,120.50, *to the defendant.* Fisk & Hatch had a private account with Hasbrouck, and another account with the defendant.   It was upon the latter the credit was made.   On the 31st of July, 1867, Fisk & Hatch, after selling the bonds, wrote to the defendant as follows :

"A. OSTERHOUT, *Cashier, Kingston, N. Y.*

" DEAR SIR.—We have received your favor of the 11th and 12th instant, and credited your account for the seven-thirties bought of you as per statement, $11,119.38. Account not yet at hand.   Very truly,

"FISK & HATCH.   (McKEAN.)"

There was some evidence given in the case showing that the plaintiff, on former occasions, from 1864 to 1867, had negotiated with Hasbrouck for the purchase, sale or exchange of bonds.   Some of these transactions were before Hasbrouck was president of the defendant's bank.   A few days after the transaction for which this action is brought Hasbrouck failed, largely indebted to the defendant's bank.   The plaintiff demanded the avails of his bonds, which was refused by the bank on the ground that the transaction was between the plaintiff and Hasbrouck individually.   At the close of the evidence the defendant's counsel moved for a nonsuit on the following grounds :

1st. That by the written contract, executed by Hasbrouck when these bonds or notes were taken for exchange, he made

himself individually and personally liable, and not the bank.

2d. This transaction was not the legitimate and ordinary banking business, for which the bank could be made liable by the act of its president, and because this is especially applicable to the case of Van Leuvan, who was a stockholder in the bank.

3d. That even though it were possible for Hasbrouck to bind the bank by a transaction like this, it could only be in a case where either express authority was conferred upon him by the bank to bind it, or, secondly, where the bank had apparently clothed him with power to do such an act.

This motion was denied by the court.

The defendant's counsel asked to go to the jury upon the question whether the plaintiff dealt with the bank or with Mr. Hasbrouck. The plaintiff was willing to go to the jury to remove that question from the case. After some discussion between the defendant's counsel and the court, whether there was any question for the jury, the court directed a verdict in favor of the plaintiff for $12,299.51, the amount of the proceeds of the bonds and interest. The defendant's counsel excepted.

*S. Hand* and *J. Hardenburgh*, for the plaintiff.

*T. R.* and *F. L. Westbrook*, for the defendant.

Present—MILLER, P. J.; P. POTTER and PARKER, JJ.

By the Court—P. POTTER, P. J. The defendant's bank, if organized under the act of congress of June 3, 1864, as I think it was, was authorized to negotiate, buy and sell, or exchange, as a corporation, the kind of property which is the subject of this action. The president of the bank, as an individual, was not prohibited from doing the same act. The defendants advertised themselves as agents of the government to perform that kind of agency, by posting up conspicuous notices upon

cards in their banking room, and exhibited such notice to the public from their windows. This apparent authority to third persons was the real authority. They could perform this agency for their bank, only through the ordinary methods of performing corporate duties, viz., by their executive officers. If the bank performed this duty in the case before us, the president and cashier would be naturally, and were the ordinarily legitimate agents to perform that duty; and the indicia of their official or executive action would accompany the evidences given or received. In that respect, the receipt given in this case is peculiar. It presents upon its face an official caption showing corporate agency, with the names of the executive agents of the corporation. None of these indicia belong to individual transactions. Then follows the body of a receipt, signed, it is true, by but one person, and in the language of the first person singular; but that person is the same whose official character stands above, upon the same instrument, as the corporate agent. Possessing such a form, with no extrinsic evidence to change its character, it is an instrument, *prima facie*, at least, of a corporate act. There was, then, not only this holding out to the plaintiff of a negotiation with him by the bank, but the bank itself treated the transaction as its own, with itself and with others. Its cashier, in whose presence the transaction was had, on the same day, by a communication headed by the same corporate agency caption, with the names of the same executive officers of the corporate agency, communicated with a noted banking house in New York the intent of the defendants to forward the notes in question for *sale for the defendants*, with directions to place the proceeds, when sold, to the credit of the defendants; and signing the notice and direction as cashier of the defendants. These instructions were obeyed by the New York house, and the proceeds were credited to the defendants. Up to this point, as a question of fact, this was no individual transaction; and no judge, upon this presentation, would have been justified to have submitted it to a jury to find whether this was an individual transaction. These seven-

thirty notes were taken by the defendants from the plaintiff to be exchanged for him. They did not perform their agreement. They were liable to the plaintiff for the avails, or the value, these avails which they had put to their own credit. They belonged to the plaintiff. If the exchange to be made may be presumed to have been intended by the parties to include the right to sell the one and purchase the other, they were then the plaintiff's brokers, and had failed to perform their whole duty to him. The money in their hands was the plaintiff's money, and, upon demand, he was entitled to receive it. It was money received by them to his use.

I have, thus far, treated this case as if the transaction was between the plaintiff and the defendant, to see whether the ruling of the judge could be sustained in directing the jury to find a verdict for the plaintiff, and that there was no question of fact for the jury. If this theory of the judge was right, the judgment is right; and we have said that upon the face of the papers this theory was right.

But suppose it was the intention of Hasbrouck, the defendant's president, to make it his individual transaction; some evidence was offered tending to prove this; it must be that the plaintiff also so understood it, or it did not then amount to a contract; but assume this also, how do the defendants then get title to this money? The law will presume that a contract made in the bank, in banking hours, by its officers, carries knowledge to the, bank itself of the character of the contract. If that contract was with Hasbrouck individually to exchange these notes, the bank then knew these notes had not been so exchanged; if it was to sell them and purchase five-twenty bonds, the bank knew this contract had not been performed. They were not holders of this money in good faith; the bank itself, even upon that theory, had sold these bonds; they had paid no consideration for them; they were neither *bona fide* holders of the bonds from Hasbrouck, nor of the proceeds of them. The knowledge of Hasbrouck, the president, and of Osterhout, the cashier, of the manner that these bonds had been obtained, was knowledge to the bank. If, then, this was

an individual transaction of Hasbrouck, it did not change the question as to his knowledge of the transaction; still, as president of the bank, he knew the property was the plaintiff's property; neither he nor the cashier, nor both together, could by any entries in the books of the defendant, of credit to themselves, or credits to Hasbrouck, without plaintiff's consent, change the title to this property from the plaintiff to themselves or to Hasbrouck. There is no evidence that Hasbrouck bought them, and the receipt he gave negatives this idea. What, then, is the error of the court in refusing to submit this immaterial question to the jury? But it seems to be the theory of the defendant that these notes were purchased by Hasbrouck of the plaintiff, and that the bank purchased them of Hasbrouck on the same day, and the books of the bank, to show such to be the transaction, was given in evidence by them under plaintiff's objection. The bank book did show that Hasbrouck was credited on that day with $10,000, and when returns came from the sale in New York he was credited with $1,119.38 more, the amount of the premium, but no such agreement is proved.

It can hardly be admitted as a sound legal proposition, that such entries by the bank officers, or by their clerks, unknown to the plaintiff, can be binding upon him or affect his legal rights; that was not the plaintiff's contract; the defendant could not make one for him; his contract was in writing; *prima facia* the writing is the true legal contract. Until that agreement is proved to be different, crediting Hasbrouck with $10,000, which the bank knew did not belong to him, was a fraud, and permitting Hasbrouck to draw it out, if he did so, was a fraud. Whether done by an innocent clerk or otherwise, the bank knew it was a fraud. I mean, that is the legal presumption, because the law casts the knowledge of the *mala fides* on them. If, instead of drawing it out afterward, Hasbrouck's account was overdrawn at the time, and this added so much to the defendant's security against Hasbrouck by making his account so much better, and themselves so much richer, the fraud is no less. So that

in this view, it seems to me to be immaterial whether the transaction between the plaintiff and Hasbrouck was with the latter as an individual or as the representative of the bank; the bank cannot be a *bona fide* holder of this money. By the testimony of the cashier, it had been drawn out before it was credited to Hasbrouck; so the bank gave no consideration for it. If this view of the case is correct, there was no material question of fact to be submitted to the jury. The legal propositions, so ably argued by the defendant's counsel, have not, in my opinion, a basis of fact upon which they can be applied. They are sound enough upon the assumed case, but do not require discussion in the case before us. I think the judgment should be affirmed.

Judgment affirmed.